IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Jasen Barker,

    Plaintiff,

v.      Case No. 2:07-cv-946

Andrew Goodrich, et al.,      MAGISTRATE JUDGE KEMP

    Defendants.

OPINION AND ORDER

I. Introduction

Jasen Barker, a state prisoner, filed this civil rights action under 42 U.S.C. §1983. All of the defendants are employees of the Ohio Department of Rehabilitation and Correction, and they were all employed at the London Correctional Facility on February 4, 2007. On that date and the following day, Mr. Barker was held, in handcuffs, in an observation cell for approximately twelve hours. He claims that this confinement violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution. All defendants have moved for summary judgment, arguing both that their actions did not violate the Constitution and, even if they did, that they are entitled to qualified immunity because a reasonable person would not have understood those actions to be in violation of the Constitution. For the following reasons, the motion for summary judgment will be granted.

II. The Summary Judgment Standard

Summary judgment is not a substitute for a trial when facts material to the Court's ultimate resolution of the case are in dispute. It may be rendered only when appropriate evidentiary materials, as described in Fed. R. Civ. P. 56(c),

demonstrate the absence of a material factual dispute and the moving party is entitled to judgment as a matter of law. Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464 (1962). The moving party bears the burden of demonstrating that no material facts are in dispute, and the evidence submitted must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). Additionally, the Court must draw all reasonable inferences from that evidence in favor of the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654 (1962). The nonmoving party does have the burden, however, after completion of sufficient discovery, to submit evidence in support of any material element of a claim or defense on which that party would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). Of course, since "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, the responding party is only required to respond to those issues clearly identified by the moving party as being subject to the motion. It is with these standards in mind that the instant motion must be decided.

   III. Mr. Barker's Version of the Key Events

What happened to Jasen Barker - that he spent more than twelve hours in an observation cell with his hands cuffed behind his back - is not really disputed. The parties disagree about why it happened, and, in particular, whether Mr. Barker passed up multiple opportunities to have the handcuffs removed. Because

the case is before the Court by way of a summary judgment motion, the Court cannot consider defendants' version of the events when it differs from Mr. Barker's. His deposition testimony paints the following picture of what occurred on February 4, 2007.

According to Mr. Barker, soon after he arrived at the London Correctional Facility, defendant Andrew Goodrich, a corrections officer, started to harass him. For example, if Mr. Barker were watching television in the day room, Officer Goodrich would pass by and turn the television off or turn the volume down so that it could not be heard. That situation never led to any confrontations, but another situation did.

Mr. Barker was being treated for depression. His medications had a tendency to make him drowsy. He would occasionally be sleeping during the four o'clock count. Usually, the corrections officer conducting the count in his area would wake him up and tell him he had to be sitting up during count. On the day in question, that did not happen. Rather, he was awakened and immediately escorted to the Captain's office. He was not sure, even after arriving there, why he was being disciplined, but learned at some point that he was going to get a ticket for refusing to sit up during the count.

Mr. Barker believed that the shift officers had been told by his mental health treater, Dr. LeClaire, that his medications were causing him to sleep during the count and that he did not have to sit up for it. He was upset by the ticket and by the fact that he was going to be taken to isolation. One of the questions that is routinely asked to inmates being taken to isolation is whether they intend to harm themselves. He refused to answer the question. For that reason, he was sent to an observation cell (a "constant watch" cell) so that a guard could watch him at all times.

Mr. Barker had just come out of a similar cell at a

different institution when his deposition was taken.  He said the
correct procedure for taking an inmate to the observation cell
was to put him in a processing cell first where his handcuffs and
clothing would be removed and a suicide gown and blanket would be
issued.  That did not happen at London.  Rather, he was put into
the observation cell while still in handcuffs and while still
wearing his prison clothes.

Mr. Barker does recall being asked once if he wanted the
handcuffs removed.  His response at that time was to ask to see a
mental health representative.  That request was refused.  He did
not remember anyone asking him again if he would agree to have
the handcuffs taken off.  Over the course of the next twelve
hours, he talked to several different corrections officers.  None
of them honored his request for a mental health representative.
It was not until sometime the next day that a team of officers
arrived, entered his cell, and removed his handcuffs.

During the time he was in the cell and in handcuffs, he was
not able to urinate or get a drink of water.  His shoulders
became stiff and he could not sit down or lie down comfortably,
so he mostly stood up.  Even at the time of his deposition, he
had problems with his wrists, especially while writing letters.

The defendants' version is, of course, different.  They
claim that the only reason that Mr. Barker stayed handcuffed is
that he refused to place his hands outside the cell so that the
cuffs could be removed.  He was "making a statement" about the
fact that he was being treated unfairly.  At that time, it was
prison policy to "wait out" any inmate who would not let himself
be uncuffed rather than assemble a strike team to remove the
cuffs forcibly.  Eventually, the officer in charge decided to put
a team together, but when Mr. Barker saw the team approach his
cell, he voluntarily relinquished the handcuffs.  He was asked at
that time if he was hurt in any way, and he said no.  While in

the cell, he was able to use the toilet and get himself a drink of water.  None of these factual assertions can be considered here, however, because the Court has to assume that Mr. Barker's version of the facts is true.

IV.  Was There a Constitutional Violation?

In most cases involving a claim that state officials' actions violated the United States Constitution, the Court first determines whether that violation occurred - or, if the issue is raised in a summary judgment motion, whether a reasonable trier of fact could so conclude.  Then, if qualified immunity has been raised as a defense, the Court decides if the right in question was so clearly established that a reasonable state official is presumed to have known of the right and appreciated that his or her conduct deprived the plaintiff of that right.  However, in some cases, the Court may skip over the issue of a constitutional violation and proceed directly to the qualified immunity question.  See Pearson v. Callahan, 129 S.Ct. 808 (2009).  Among other reasons for doing so, the posture of the case when the constitutional issue is presented "may create a risk of bad decisionmaking."  Pearson, 129 S.Ct. at 820.  That does not appear to be the case here.  Therefore, the Court chooses to address the constitutional issue first.

The defendants correctly recognize that the Eighth Amendment can be violated if prison officials use an amount of force (or, in this case, restraint) that is not reasonably related to legitimate correctional concerns but is, rather, simply the "unnecessary and wanton infliction of pain ...."  Whitley v. Albers, 475 U.S. 312, 319 (1986).  The continued use of restraints on a prisoner after any security threat which initially justified the placement of those restraints may, under appropriate circumstances, violate the Eighth Amendment's ban on cruel and unusual punishment.  See, e.g., Hope v. Pelzer, 536

U.S. 730, 738 (2002) (noting that restraining inmate to a hitching post in a prison yard for seven hours during which the inmate was exposed to the sun, to prolonged thirst and taunting, and deprived of bathroom breaks after "[a]ny safety concerns had long since abated" and "[d]espite the clear lack of an emergency situation" constituted a clear Eighth Amendment violation). Hope, in turn, relied on such cases as Rhodes v. Chapman, 452 U.S. 337 (1981), which condemned the infliction of pain on a prisoner for totally punitive purposes as opposed to pain which results from the use of force or restraints for purposes legitimately related to such state interests.  Such interests might include security, protecting the inmate or others from a risk of physical harm or preventing the inmate's escape from custody.

There are relatively few cases dealing with keeping an inmate in handcuffs for a prolonged period of time.  Kennedy v. Doyle, 37 Fed. Appx. 755 (2002), an unreported case from the Court of Appeals for the Sixth Circuit which is cited by both parties, summarily dismissed a claim that a prolonged stay in handcuffs violated the Eighth Amendment, but only because the inmate persisted in destructive behavior even while restrained, thus justifying the use of restraints.  The decision cited Rhodes v. Chapman, supra, for the proposition that a penological justification is required for the prolonged use of restraints. Williams v. Benjamin, 77 F.3d 756 (4th Cir. 1996) found an issue of fact concerning the use of prolonged restraints, but that case involved an inmate who had been maced and was then refused permission to wash the mace off his face, causing him to experience extreme pain.  Fuentes v. Wagner, 206 F.3d 335, 342-43 (3d Cir. 2000), upheld a jury verdict in favor of defendants in a case where an inmate had been confined in a restraint chair for eight hours, but the court noted that there had been evidence

that the chair had been used not to restrain the plaintiff in order "to quell a disturbance and restore the order and security of the institution," but rather as punishment, which presumably would have supported a verdict going in the other direction. Zimmerman v. Schaeffer, __ F.Supp. 2d __, 2009 WL 2568052 (M.D. Pa. August 17, 2009), found triable issues of fact where inmates were kept in restraint chairs for hours or days at a time following incidents in which the inmates committed minor property damage, and were also shocked while restrained and forced to use a diaper. Although none of these factual situations are identical to the one presented here, they demonstrate that in this type of case, the question is whether "the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain ...." Whitley v. Albers, 475 U.S. at 322. If not, "the case should not go to the jury." Id.

Here, there would appear to be no question that the initial restraining of Mr. Barker pending his trip to the segregation unit was justified by a need to maintain or preserve order or security, and he does not argue otherwise. Once he was placed securely in the constant watch cell, however, the threat to the transporting officers had largely dissipated. Even the defendants agree that the normal practice would have been to remove Mr. Barker's handcuffs at that time. Certainly, if he refused to have them removed, as the defendants contend, and if additional security issues would have been presented by the use of a strike team to enter his cell and subdue him so that his handcuffs could be removed, there was a legitimate reason at least to delay that action in order to insure that when it took place, it was truly a last resort. However, under Mr. Barker's version of the facts, he did not refuse to be uncuffed and that action could have been accomplished easily and without resistance

in the early stages of his twelve-hour restraint period.  If that were true, and the defendants left him handcuffed, unable to sit or lie down comfortably, unable to get a drink of water, and unable to use the toilet, simply in order to punish him, a reasonable jury could find that the Eighth Amendment was violated.  Thus, summary judgment cannot be grated on the basis that no constitutional violation occurred.

    V.   <u>Are the Defendants Entitled to Qualified Immunity?</u>

Public officials sued under 42 U.S.C. §1983 in their individual capacities may raise qualified immunity as a defense to the suit.  That defense has been explained as follows:

> [G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known.

<u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  Conversely, "if the law was clearly established, the immunity defense should fail, since a reasonably competent public official should know the law governing his conduct."  <u>Id</u>. at 818-19.

As explained in <u>Dominique v. Telb</u>, 831 F.2d 673 (6th Cir. 1987), when the defense of qualified immunity is raised, a plaintiff must include in the pleadings factual allegations necessary to support the conclusion that the defendants violated clearly established law.  When the defense is raised by motion, "the District Court must decide the purely legal question of whether the law at the time of the alleged action was clearly established in favor of the plaintiff."  <u>Id</u>.  The Court's decision on this issue should indicate the law as the Court perceives it and the basis for its conclusion that the constitutional rights at issue were clearly established.

In order for a constitutional right to be clearly established, it is necessary that a decision of the Supreme

-8-

Court, the highest Court of the state, or a Court of Appeals announce the constitutional principle. See Robinson v. Bibb, 840 F.2d 349 (6th Cir. 1988). A single, idiosyncratic decision from one Court of Appeals is not sufficient to establish clearly a constitutional right. Davis v. Holly, 835 F.2d 1175 (6th Cir. 1987).

> Although official action is not necessarily protected by qualified immunity unless and until the very action in question has been held unlawful...an official is not bound to anticipate correctly possible future extensions of the law if the question of law was open at the time he acted.

Garvie v. Jackson, 845 F.2d 647, 652 (6th Cir. 1988).

To answer the question of qualified immunity presented here, the Court turns to the Supreme Court's decision in Hope v. Pelzer, 536 U.S. 730 (2002). There, the defendants argued (as do the defendants here) that they could not have appreciated the wrongfulness of their conduct because there were no cases holding that the precise scenario involved - tying an inmate to a hitching post in a prison yard for seven hours - violated the Eighth Amendment. In rejecting that argument, the Supreme Court held that "officials can still be on notice that their conduct violates established law even in novel factual circumstances," but only if the state of the law at the time of the occurrence "gave [officials] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." Id. at 740. In that case, the state of the law gave fair warning because there were prior cases holding that prolonged handcuffing of inmates to fences or other objects, or depriving them of water, for purposes of punishment constituted Eighth Amendment violations. Further, both a study by the Department of Justice and the prison's own regulations suggested the impropriety of the practice.

Here, the law is not so clear. Mr. Barker was not

handcuffed to anything, nor was he exposed to harsh sunlight or taunting.  He was not prevented, by virtue of the handcuffs, from washing chemicals from his face or skin that were causing him pain.  It is not at all clear that the prison officials were made aware that he could not get a drink of water or use the toilet, or that he could not find a comfortable position due to the presence of the handcuffs.  Further, a portion of the time he spent in handcuffs is clearly attributable to the need to escort him in restraints to the segregation area and to make sure he was not combative or a threat to himself once he arrived there.  Thus, although this is a close case on the immunity question, the Court is not persuaded that either the cases cited by Mr. Barker, or those identified through the Court's own research, constituted the type of clearly established law which can defeat a claim of qualified immunity.  Were this a case of "restraints plus" - that is, that the handcuffing was accompanied by some other condition which was obviously contributing to the pain being suffered by the plaintiff, such as that present in <u>Williams v. Vidor</u>, 17 F.3d 857 (6th Cir. 1994), where the inmate was not only restrained for 72 hours but also was suffering from abdominal pain due to an exposed incision - the outcome might be different.  This Court is not prepared to hold, however, that these defendants were on fair notice in February, 2007, that their conduct violated the Eighth Amendment.  Consequently, summary judgment is appropriate on that ground, and there is no need to address the other arguments which defendants have advanced in support of their motion.

VI.  <u>Conclusion</u>

For the following reasons, the defendants' motion for summary judgment (#61) is granted.  This case is dismissed with prejudice, and the Clerk is directed to enter judgment in favor of all defendants.

/s/ Terence P. Kemp

United States Magistrate Judge